T.C. Memo. 2013-35

UNITED STATES TAX COURT

JURATE ANTIOCO, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29182-09L.                    Filed February 4, 2013.

Steven L. Walker, for petitioner.

Lesley A. Hale and Thomas R. Mackinson, for respondent.

MEMORANDUM OPINION

HOLMES, Judge: Jurate Antioco is a 71-year-old woman living with her 96-year-old mother in an apartment building that Ms. Antioco owns. She owed the Commissioner over $170,000 in tax, but because she had put most of her wealth into the apartment building, she didn't pay it. When the Commissioner told Ms. Antioco that he intended to seize the building, she proposed instead that she pay

[*2] something each month while searching for a lender who would let her use her considerable equity in the building to refinance it and let her and her mother stay. The Appeals officer rejected her proposal, and Ms. Antioco appealed.

The Commissioner conceded before trial that the Appeals officer abused her discretion by not asking Ms. Antioco to submit revised financial information, and we remanded for a supplemental hearing. On remand a different Appeals officer never asked for or looked at the financial information we had told him to, but quickly concluded that Ms. Antioco had committed fraud--actual or constructive--and placed a lien on the building and went back to suggesting the IRS seize and sell it.

The Commissioner now agrees that Ms. Antioco didn't commit fraud, but argues that rejection of the installment agreement was still appropriate because she could fully pay her tax liability. Ms. Antioco again disputes the determination, and urges us to finally shoot down the series of moving targets that the Commissioner keeps placing between her and a reasonable collection alternative to the forced sale of her livelihood and residence.

[*3]                              Background

I.     Origins of Case

Ms. Antioco was married to Peter Antioco for 27 years. During their marriage they lived in Martha's Vineyard, where they owned and operated a bed and breakfast that was also their home. In 2006 the Antiocos divorced and sold the B&B for almost $2 million. Part of the money paid off their marital debts, but Ms. Antioco received around $165,000 in sale proceeds at the end of 2006, and another $881,000 in early 2007 when she was unable to conduct a section 1031 like-kind exchange within the required time.[1]

After the divorce and almost a year of living in temporary housing, Ms. Antioco eventually settled in California. With her share of the sale proceeds and a $950,000 bank loan she bought a small apartment building in San Francisco for $1.9 million in March 2007. Ms. Antioco moved into the building and still lives in

---

[1] Section 1031 says that a taxpayer doesn't have to recognize gain or loss on the exchange of property held for productive use in a trade or business or for investment if she exchanges the property solely for property of "like kind" that she also holds for productive use in a trade or business or for investment. To qualify, she must complete the exchange within 180 days of transferring the exchanged property. See sec. 1031(a)(3); sec. 1.1031(k)-1(b), Income Tax Regs. (Unless we say otherwise, all section references are to the Internal Revenue Code in effect at all relevant times.)

[*4] one of its five units, while her 96-year-old mother lives in another. She rents out the remaining three as a source of income.

Though Ms. Antioco knew she had received money from the bed and breakfast's sale, she didn't think she owed any tax on the sale because the B&B had been her primary residence. Not until April 2008--more than a year after she bought the apartment building--did she learn from her accountant that she owed thousands of dollars in tax.

Ms. Antioco filed her 2006 and 2007 tax returns in August 2008, and reported the gain from the sale using the installment-sale method. She reported tax liabilities for the two years totaling about $170,000--resulting mostly from her capital gain from the bed and breakfast's sale. But she didn't submit payments with her returns-- after all, she had put almost all her money into the apartment building--and so the Commissioner assessed the tax, along with interest, penalties, and additions to tax.

II.    Initial Hearing

In April 2009 the Commissioner sent Ms. Antioco a notice of intent to levy, which told her that the IRS was about to seize her property to pay the 2006 and 2007 tax. Ms. Antioco, realizing her only significant asset was the apartment building that she and her mother lived in, asked for a collection due process (CDP)

**[*5]** hearing and proposed an installment agreement of $1,000 per month until she could get a loan to pay her tax bill in full. She explained that she wanted an installment agreement because she was the primary caretaker for her elderly mother, who had recently experienced health problems, and that the proposed levy on the property would cause them both "economic hardship." She began making $1,000 monthly payments toward her tax bill.

Ms. Antioco also began contacting potential lenders for a loan. She quickly learned that though she had significant equity in the building, refinancing wouldn't be easy because the loan agreements with her current lender gave it the right to foreclose on the apartment building if another lien was placed on the property without the lender's consent. Her current lender informed her it was unwilling to consent to a second mortgage on the property because doing so would result in an unacceptable debt-service coverage ratio.[2] It also told her it wasn't willing to refinance her existing loan to allow her to tap into some of the building's equity because her income was too low.

In July 2009 an Appeals officer sent Ms. Antioco a letter to set up a telephone CDP hearing for September 2009 and to ask for financial information.

---

[2] Debt-service coverage ratio is a ratio to measure a property's amount of available cash remaining after servicing the loan payments.

**[*6]** Ms. Antioco responded with a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, along with her substantiating documents and her most recent tax return. Around that same time Ms. Antioco and her mother found a new lender--Luther Burbank Savings--that was willing to refinance her existing loan on the apartment building at a reduced interest rate, but still would not allow Ms. Antioco to pull cash out of the property.

The CDP hearing went forward as scheduled several days later. At the hearing, the Appeals officer told Ms. Antioco that before she could consider an installment agreement, Ms. Antioco would have to try to borrow against the equity in her apartment building. Ms. Antioco explained the difficulties she had had trying to do just this, but mentioned that she had recently received a loan-commitment letter from Luther Burbank Savings. The Appeals officer asked Ms. Antioco to submit proof of her attempts to refinance before she made her determination.

Several weeks later, Ms. Antioco sent in that proof. Included with the documents was a copy of the Luther Burbank Savings loan-commitment letter that listed Ms. Antioco and her mother as borrowers and approved the refinancing. The commitment letter noted that one condition of the refinancing was: "Title to correct vesting through escrow and provide a certified copy of the Grant Deed."

**[*7]** This meant that Ms. Antioco had to add her mother's name to the deed, which she did by granting her a joint-tenancy interest in the property. The loan closed by the end of September 2009.

After not hearing from the Appeals officer for several months, Ms. Antioco received a notice of determination sustaining the proposed levy in November 2009. The notice stated that Ms. Antioco had shown she was unable to borrow against the equity in the apartment building, but that Appeals couldn't consider an installment agreement because of the Appeals Officer's inability to verify Ms. Antioco's monthly business income without a revised Form 433-A. The notice concluded that the proposed levy balanced the need for efficient collection, but didn't address Ms. Antioco's economic-hardship argument.

Ms. Antioco appealed the determination and argued that the Appeals officer never asked her to submit a revised Form 433-A. She also reiterated that she and her mother would experience "great economic hardship" if she couldn't get an installment agreement. Before trial the Commissioner moved to remand the case on the ground that the Appeals officer had abused her discretion by not asking Ms. Antioco to submit a revised Form 433-A and additional documentation relating to her monthly business income. We granted the motion and remanded the case to Appeals.

**[\*8]** III.    <u>Supplemental Hearing</u>

On remand the Appeals officer assigned to the case was Alan Owyang. The day he received the case, Mr. Owyang called Ms. Antioco to schedule a face-to-face hearing and asked her to confirm numerous details about her case. Ms. Antioco told him that she would call him back later that day when she had her documents relating to the case and could better answer his questions. Mr. Owyang didn't wait--he called Ms. Antioco several more times that day and at one point told her she was being uncooperative and that she didn't have to go through with the case. He also told her to "put your money where your mouth is" and that he had been a witness in Tax Court. Ms. Antioco felt so threatened by Mr. Owyang's calls that she stopped answering and hired an attorney to help her.

Mr. Owyang followed up his calls with a letter several days later. In it he stated that he had preliminarily determined Ms. Antioco's decision to add her mother to the title had "*essentially* rendered [her] insolvent and devoid of any equity in assets," and that Ms. Antioco could pay her liabilities but "*simply chose not to do so*." The letter also asked Ms. Antioco to submit various documents, including documentation relating to the sale of the bed and breakfast, the Luther Burbank Savings loan, and the grant deed to her mother, but not--curiously in light of the terms of our remand--a revised Form 433-A.

**[*9]**  Ms. Antioco's attorney submitted a package of documents, along with a renewed request for an installment agreement, and scheduled another telephone CDP hearing with Mr. Owyang for the beginning of April 2011.  He explained that Ms. Antioco feared that her mother would not be able to survive the apartment building's sale and move to another location because of her declining health.  He again asked for a short-term installment agreement until she could get financing or her mother passed away.

At the hearing Mr. Owyang told Ms. Antioco's attorney that he could not consider an installment agreement because Ms. Antioco could fully pay her liabilies but had transferred all her equity in the apartment building to her mother by adding her to the deed.  He also refused to consider Ms. Antioco's "hardship" argument and noted in the case activity record that "[t]he issue[] of  * * * her 95-year old mother (to explain why she cannot sell) [is a] diversionary argument[] that I will not consider."

Because he believed the government's interest in the building was in jeopardy, Mr. Owyang contacted the IRS Compliance Division to file a manual lien against the apartment building before he issued a supplemental notice of determination.  There were problems filing the lien, and several months later Mr. Owyang emailed the revenue officer responsible for the lien filing to check on its

[*10] status.  He told the revenue officer that he wanted a lien filed "because the federal government was completely unprotected as it relates to a valuable piece of real property belonging to the taxpayer and then removed, by the taxpayer, from the government's reach in response to a CDP levy notice."

In May 2011 Mr. Owyang issued a supplemental notice of determination sustaining the proposed levy.  The notice concluded that Appeals could not consider her proposed installment agreement because there was over $900,000 in equity in Ms. Antioco's apartment building and she had fraudulently transferred it to her mother.  It went into great detail explaining the numerous factors that Mr. Owyang believed showed Ms. Antioco had committed fraud, including that she concealed the transfer from the government, became insolvent as a result of the transfer, and was left without any "equity in assets" to pay the federal government.  It also suggested that Ms. Antioco could've gotten a loan from a financial institution to pay off her liabilities.  And it concluded that Ms. Antioco was a "non-compliant"and "won't pay taxpayer" who refused to provide numerous requested documents and was "using her 95 year old mother as an emotional diversion."

IV.    Motion for Summary Judgment

The case came back to us, and the Commissioner moved for summary judgment on the ground that Mr. Owyang did not abuse his discretion when he

**[\*11]** rejected Ms. Antioco's proposed installment agreement. The Commissioner admitted during a hearing on the motion that Mr. Owyang didn't perform the insolvency analysis necessary to find constructive fraud and that Mr. Owyang's analysis of actual fraud was flawed. He also conceded that Mr. Owyang didn't consider Ms. Antioco's hardship argument and that a number of Mr. Owyang's conclusions were not supported by the administrative record. But he argued that we should find no abuse of discretion because Ms. Antioco can fully pay her 2006 and 2007 liabilities. We denied the motion because there was a genuine dispute as to what should be in the administrative record,[3] and the case proceeded to trial.

Discussion

I.       General Principles of Collection Due Process

Once the Commissioner assesses a tax, he can collect any unpaid portion of it by filing liens against, and levying on, a taxpayer's property. See secs. 6321,

---

[3] Ms. Antioco was and still is a resident of California, so her case would ordinarily be appealable to the Ninth Circuit. That court requires us to follow the "record rule," which means we must look at the same things that the Commissioner looked at (i.e., the "administrative record") to decide whether Mr. Owyang abused his discretion in upholding the proposed levy. See Keller v. Commissioner, 568 F.3d 710, 718 (9th Cir. 2009), aff'g in part as to this issue T.C. Memo. 2006-166.

**[\*12]** 6331(a).  But first he has to notify the taxpayer whose property he wants to take.[4]  See sec. 6330(a)(1).  He does this by sending the taxpayer a standard form (such as Notice of Federal Tax Lien or Notice of Intent to Levy).  See secs. 301.6320-1(a)(1), 301.6330-1(b)(3), Proced. & Admin. Regs.

The Code gives taxpayers who receive one of these notices the right to a hearing before the Commissioner can use a lien or levy to collect the unpaid taxes.  See secs. 6320(a)(3)(B), 6330(a)(3)(B).  But the taxpayer must ask for a CDP hearing within 30 days.  See id.  If the taxpayer does, then an IRS employee--called an Appeals officer--holds the hearing with the taxpayer.  See secs. 6320(b)(1), 6330(b)(1).

A taxpayer can raise at the hearing any relevant issue relating to the unpaid tax or proposed collection action, including challenges to the appropriateness of collection and offers of collection alternatives.  See sec. 6330(c)(2)(A).  One possible collection alternative--and the one at issue in this case--is an installment agreement, which allows a taxpayer to pay her tax debt over time if the IRS determines it will facilitate collection of the tax.  See secs. 6159(a), 6330(c)(2)(A)(iii).

---

[4] There are exceptions to this general rule that don't apply here.  See sec. 6330(f).

**[\*13]** At the end of the hearing the Appeals officer issues a notice of determination on whether the proposed collection action is appropriate. See secs. 301.6320-1(b)(2), Q&A-B3, 301.6330-1(e)(3), Q&A-E8, Proced. & Admin. Regs. The Appeals officer's determination must consider the issues the taxpayer raised and whether the proposed action balances the need for efficient collection of taxes with the legitimate concern that collection be no more intrusive than necessary. Sec. 6330(c)(3)(B) and (C). If the taxpayer disagrees with the determination, she has 30 days to appeal. Sec. 6330(d)(1).

In cases where the taxpayer's underlying liability isn't in question, we review the Appeals officer's actions for abuse of discretion.[5] Sego v. Commissioner, 114 T.C. 604, 609-10 (2000). Under this standard, we determine whether the Commissioner's rejection of the taxpayer's proposed collective alternative was arbitrary, capricious, or without sound basis in fact or law. Murphy v. Commissioner, 125 T.C. 301, 320 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006);

---

[5] A taxpayer may only challenge her underlying liability at a CDP hearing if she didn't receive a notice of deficiency or didn't otherwise have an opportunity to dispute the liability. Sec. 6330(c)(2)(B). The Commissioner's computation of the gain from the sale of the B&B was almost certainly too high--Ms. Antioco probably could've divvied up the gain and excluded the portion of the B&B that she and her ex used as their principal residence. See sec. 1.121-1(e), Income Tax Regs. But Ms. Antioco did not dispute the amount of her tax bill at either of her CDP hearings, so we can't review the amount of that liability now.

**[\*14]** <u>Woodral v. Commissioner</u>, 112 T.C. 19, 23 (1999). This means, according to the Ninth Circuit, that we look to see if the Commissioner's decision was based on an error of law or rested on a clearly erroneous finding of fact, or whether he ruled irrationally. See <u>Fargo v. Commissioner</u>, 447 F.3d 706, 709 (9th Cir. 2006), <u>aff'g</u> T.C. Memo. 2004-13; <u>United States v. Sherburne</u>, 249 F.3d 1121, 1125-26 (9th Cir. 2001).

The Ninth Circuit also tells us to follow the record rule, which limits our review of the Commissioner's determination to the administrative record at the time he made his decision. <u>Keller v. Commissioner</u>, 568 F.3d 710, 718 (9th Cir. 2009), <u>aff'g in part as to this issue</u> T.C. Memo. 2006-166. This rule has a few narrow exceptions: We can supplement the administrative record with evidence outside the record

- if necessary to determine whether the agency has considered all relevant factors and explained its decision;

- if the agency has relied on documents not in the record;

- when necessary to explain technical terms or complex subject matter; or

- when there is a showing of agency bad faith.

<u>Tri-Valley CAREs v. DOE</u>, 671 F.3d 1113, 1130 (9th Cir. 2012); <u>Lands Council v. Powell</u>, 395 F.3d 1019, 1030 (9th Cir. 2005). But these exceptions apply only to

**[\*15]** information available at the time of the decision--we can't use postdecision information as a reason to sustain or attack the agency's decision. Tri-Valley CAREs, 671 F.3d at 1130-31.

The Commissioner conceded during the hearing on his summary-judgment motion that a number of Mr. Owyang's determinations could not be explained by the administrative record. And it became apparent that the administrative record the Commissioner had compiled for the motion was incomplete. We ordered trial for the limited purpose of supplementing the record with information that should have been included that wasn't and that was necessary to explain the Commissioner's decision. See Friends of the Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 997 (9th Cir. 1993); Kreit Mech. Assocs., Inc. v. Commissioner, 137 T.C. 123,131 (2011).

Before trial the Commissioner's lawyers tracked down a number of documents that should've been in the administrative record--like Mr. Owyang's case activity record and the account transcripts. They also attempted to supplement the Commissioner's determination and remedy its errors with Mr. Owyang's testimony about the findings he made in the supplemental notice of determination. This raised even more questions about Mr. Owyang's reasoning and the findings that he had made.

**[\*16]** II.     The *Chenery* Problem

A.     Reasons for Determination to Proceed With Levy

1.     Fraud

One reason Mr. Owyang sustained the proposed levy is that he determined Ms.

Antioco had fraudulently transferred her apartment building to her mother.  This

transfer, he said, rendered her insolvent and left her without equity in the building.  At

trial he backpedaled and stated that he meant to say "less solvent," although he

admitted that he hadn't performed any insolvency analysis at all.

Under California law,[6] constructive fraud occurs when a person transfers

property without receiving reasonably equivalent value in exchange, and the

transferor (1) either (a) engaged in a transaction for which the transferor's

remaining assets are unreasonably small in relation to the transaction or (b) intended

to incur (or reasonably believed that she would incur) debts beyond her ability to

pay), Cal. Civ. Code. sec. 3439.04(a)(2) (West 1997 & Supp. 2013), or (2) is either

---

[6] We look to state law to determine whether there was a fraudulent transfer. See Dalton v. Commissioner, 135 T.C. 393, 407, 411 (2010), rev'd on other grounds, 682 F.3d 149 (1st Cir. 2012); Hudgins v. Commissioner, T.C. Memo. 2012-260, at \*27-\*28.  Mr. Owyang did not specifically mention California fraudulent-transfer law in his supplemental notice of determination.  He instead used general principles of state and federal fraudulent-transfer law to make his determination, but because California fraudulent-transfer law matches up with Federal and other states' fraudulent-transfer law, we find neither error nor a lack of reasonableness in his reasoning on this specific issue.

**[*17]** insolvent or becomes insolvent from the transfer, Cal Civ. Code sec. 3439.05 (West 1997). Mr. Owyang's determination that Ms. Antioco committed fraud is just plain wrong--wrong as a matter of law, because he didn't know what constructive fraud meant, and clearly erroneous as a matter of fact because he did not determine whether Ms. Antioco had actually committed constructive fraud under any of those tests.

But Mr. Owyang also determined that a number of facts pointed to actual fraud. These included Ms. Antioco's transfer of the property for inadequate consideration, her supposed concealment of the transfer from the government, and her alleged removal of the building from the government's reach. He also noted that "[b]ecause of the taxpayer's prior non-compliant behavior, it is with *absolute certainty* that the sale and transfer was done to defeat the administration and collection of the petitioner's federal income tax arrears for 2006 and 2007." At trial Mr. Owyang explained that he thought Ms. Antioco intended to place the property out of the government's reach because he couldn't figure out why a financial institution would request that her 95-year-old mother be added to the deed. Yet he also admitted that he saw the prior Appeals officer's notes about the Luther Burbank Savings refinancing in the case activity record and that the administrative files he received contained documents related to the refinancing.

**[*18]** Actual fraud occurs when a person transfers property "[w]ith actual intent to hinder, delay, or defraud any creditor." Cal. Civ. Code sec. 3439.04(a)(1). There was no actual fraud here. Mr. Owyang simply, and clearly, erred. The administrative record shows that Ms. Antioco disclosed her efforts to refinance her existing loan with Luther Burbank Savings to the first Appeals officer and also disclosed the conditions she had to satisfy to do so. She provided documentation during her hearings that supported her explanation of why she made her mom a joint tenant in the apartment building. She explained why she pursued refinancing--a lower interest rate--even though the bank wouldn't let her take cash out of her equity. Mr. Owyang's determination that she concealed the transfer from the government was therefore arbitrary.

Mr. Owyang also unreasonably determined that Ms. Antioco's addition of her mother's name on the deed put the property beyond the government's reach. Once the Commissioner assesses a tax, a federal tax lien automatically attaches to all property belonging to the taxpayer. Sec. 6321. The mere attachment of that lien gives the government a fully-protected claim that is superior to all--except some full-value purchasers, secured creditors, or judgment-lien creditors of the taxpayer. See sec. 6323(a); Bank of Nev. v. United States, 251 F.2d 820, 826 (9th Cir. 1957). Ms. Antioco's mother did not pay anything for her interest, and the tax lien arose

[*19] well before the transfer occurred. This was, again, a pure mistake of law that made Mr. Owyang's determination an abuse of discretion. Because the record in this case undermines Mr. Owyang's determinations pointing to actual fraud, we cannot sustain his ultimate finding of fraud on that ground either. See Dalton v. Commissioner, 682 F.3d 149, 155 (1st Cir. 2012) ("[A] court should set aside determinations reached by the IRS during the CDP process only if they are unreasonable in light of the record compiled before the agency"), rev'g 135 T.C. 393 (2010).

### 2. Ability to Obtain Loan

The supplemental notice of determination also found that the levy should proceed because Ms. Antioco didn't show that she made an effort to obtain a loan from a financial institution to pay off her liabilities. The Internal Revenue Manual (IRM) pt. 5.15.1.26(3) (May 9, 2008) states that "[t]he equity in real estate should be pursued as a means to full pay or reduce the tax liability." It also instructs Appeals officers to ask the taxpayer to secure a loan and that the taxpayer's "[r]efusal to pro-actively seek a loan will be considered refusal to pay." Id.

The record contains a number of documents supporting Ms. Antioco's contention that she was unable to obtain a loan that would allow her to tap into some of the apartment building's equity. Ms. Antioco gave the first Appeals officer

**[\*20]** a letter from her former lender stating that it would not consent to another loan on the property and that it was unwilling to refinance or offer her another loan, along with her loan documents with that lender.  She also submitted her loan request and email communications about her request with another lender.  And she gave the first Appeals officer a copy of the Luther Burbank Savings commitment letter to refinance her existing loan, and later gave a copy of the grant deed and her loan agreement with Luther Burbank Savings to Mr. Owyang.

Based on the documents given to her, the first Appeals officer concluded that Ms. Antioco had verified her inability to get a loan to pay her tax liabilities.  And Mr. Owyang seemed to at first agree with this conclusion:  He wrote in a letter to Ms. Antioco notifying her of her remanded CDP case, "although you corroborated to the federal government that you were unable to get a loan, the federal government will ask you to full pay your income tax arrears * * * by *selling* your real property on Washington street."  Yet Mr. Owyang later concluded in the supplemental notice of determination that,

> I am not aware of any *normal business practice* whereas a financial
> institution denies a request for an equity loan (second Deed of Trust)
> and, *concurrently*, offers to subrogate an existing first Deed of Trust,
> especially since (should we believe the petitioner), by the petitioner's
> own claim, she was not, *singly*, qualified for any such substitution with
> Luther Burbank Savings.  And how did Luther Burbank Savings even

**[*21]** remotely knew [sic] that adding the petitioner's 95 year old mother to the refinancing would cinch the deal?

Then at trial Mr. Owyang conceded that the letter from Ms. Antioco's former lender--which he said he reviewed--was sufficient to show it wasn't willing to allow more debt on the property. He also expressed unfamiliarity with the term "debt coverage service ratio" and admitted that he had never worked as a bank loan officer or been in the business of refinancing commercial property. In light of the record, Mr. Owyang's determination that Ms. Antioco didn't show that she was unable to obtain a loan is clearly erroneous.

### 3. Noncompliance

Mr. Owyang also concluded that Ms. Antioco is a "won't pay taxpayer" and that her "non-compliant behavior" was a reason to reject her proposed installment agreement. This was because Mr. Owyang determined that Ms. Antioco deliberately ignored her 2006 tax liability--that she failed to make any estimated tax payments though she had the cash to do so--and instead bought the San Francisco apartment building with the proceeds she received from the B&B's sale.

There is nothing in the record to support any of these conclusions either. The record in fact shows just the opposite: Ms. Antioco didn't even find out she owed any tax for 2006 and 2007 until her accountant told her in April 2008. And she

[*22] wasn't required to make any estimated tax payments for 2006 (she had not been penalized for failure to pay estimated tax) because she didn't owe any tax for 2005. See sec. 6654(e)(2). During her CDP hearings Ms. Antioco submitted the documents the IRS asked for, and she began paying her 2006 liability even before her first CDP hearing. By the time of trial, Ms. Antioco had reduced her 2006 liability by over $88,000 through payments she made and the application of credits resulting from available net-operating-loss carrybacks. Mr. Owyang's determination that Ms. Antioco was not in compliance was clearly erroneous.

B.    Alternative Reason to Uphold Determination:  Enough Equity to Fully Pay

The supplemental notice of determination concluded that the Appeals officer could not grant an installment agreement because "there is approximately $921,740.73 in equity in the petitioner's property and because of the petitioner's transfer of her primary asset, *in fraud of a tax debt*" and "non-compliant behavior." But elsewhere in the notice Mr. Owyang determined that the transfer rendered Ms. Antioco insolvent and without any equity in the property or any means of paying the federal government. And while the notice devoted pages to analyzing Ms. Antioco's supposedly fraudulent transfer to her mother, nowhere did it explain how Mr. Owyang had determined the value of Ms. Antioco's equity in the building or

**[*23]** that the fair market value of the property was still $1.9 million (what Ms. Antioco paid for it in 2007).[7]

Yet at trial Mr. Owyang testified that the primary basis for his determination to sustain the levy was not Ms. Antioco's supposed fraudulent transfer and noncompliance, but that she had enough equity in her apartment building to fully pay her tax liability. The Commissioner now argues, based on this testimony, that the fraudulent transfer and insolvency assertions contained in the notice are harmless error because Mr. Owyang has now stated that he couldn't accept Ms. Antioco's proposed installment agreement because of the amount of equity in the building. Since we have found Mr. Owyang's other grounds for sustaining the proposed levy to be an abuse of discretion, the question now becomes: Can we uphold his determination to proceed with the levy on this new ground?

Ms. Antioco points out that the Commissioner's argument that she had enough equity to fully pay her tax bill was not one the Appeals officer relied on in the supplemental notice of determination. She says that this is the very type of impermissible *post hoc* rationalization that the <u>Chenery</u> doctrine prohibits.

---

[7] An appraisal Ms. Antioco submitted to the first Appeals officer and that is part of the administrative record valued the apartment building at $1.34 million. This was because the building's foundation was brick and was considered to be "legally non-conforming."

**[\*24]** <u>See</u> <u>SEC v. Chenery Corp.</u>, 332 U.S. 194 (1947) (<u>Chenery II</u>); <u>SEC v. Chenery Corp.</u>, 318 U.S. 80 (1943) (<u>Chenery I</u>).

The Commissioner agrees that the <u>Chenery</u> doctrine applies to this case. But he points to Mr. Owyang's testimony and the supplemental notice's mentioning that Ms. Antioco "has the ability to full pay" as supporting his argument that her ability to fully pay was the *primary* reason Appeals rejected the proposed installment agreement.

The <u>Chenery</u> doctrine is an administrative-law principle that says "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." <u>Chenery II</u>, 332 U.S. at 196 (describing its holding in <u>Chenery I</u>). The Supreme Court not too long ago announced that "we are not inclined to carve out an approach to administrative review good for tax law only" and noted "the importance of maintaining a uniform approach to judicial review of administrative action." <u>Mayo Found. for Med. Educ. & Research v. United States</u>, 562 U.S. ___, ___, 131 S. Ct. 704, 713 (2011) (citation and internal quotation marks omitted). This dictates that we follow the <u>Chenery</u> doctrine in CDP cases, as we have already done in a couple other recent cases. <u>See</u>

**[*25]** Jones v. Commissioner, T.C. Memo. 2012-274, at *22-*23; Salahuddin v. Commissioner, T.C. Memo. 2012-141, 2012 WL 1758628, at *7.

Applying Chenery in the CDP context means that we can't uphold a notice of determination on grounds other than those actually relied upon by the Appeals officer. See Chenery I, 318 U.S. at 87-88; Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010) (agency has the responsibility to articulate its reasoning); Salahuddin, 2012 WL 1758628, at *7 (stating that "our role under section 6330(d) is to review actions that the IRS took, not the actions that it could have taken"). Those grounds must be clearly set forth so that we do not have to guess about why an Appeals officer decided what he did. See Chenery II, 332 U.S. at 195. We cannot uphold his determination simply because findings *might* have been made and considerations *might* be disclosed which *might* justify his ultimate conclusion. Chenery I, 318 U.S. at 93-94.

We cannot say that Ms. Antioco's having enough equity in her apartment building to fully pay her liability was a ground that Mr. Owyang actually relied on in making his determination. Mr. Owyang determined in his own mind on the day he received the case that Ms. Antioco had fraudulently transferred her apartment building to her mother and that the transfer rendered her insolvent and without equity in the property to pay her tax bills. His conclusions changed very little

**[\*26]** throughout the rest of the time the case was before him, and he repeated them at the end in the supplemental notice of determination. The supplemental notice was so riddled with factual errors and contradictory statements that it's hard to say whether Mr. Owyang determined Ms. Antioco "has the ability to full pay" because of the equity in her property. And nowhere in it did Mr. Owyang explain how he calculated the amount of equity. We therefore reject the Commissioner's attempt at trial to make the necessary findings and arguments to justify that determination, and we refuse to rely on Ms. Antioco's supposed ability to fully pay to sustain the supplemental notice. Mr. Owyang's determination to proceed with the proposed levy in the supplemental notice of determination was an abuse of discretion.

        C.    <u>Failure to Consider Issues Raised</u>

            1.    <u>Special Circumstances</u>

Even if Mr. Owyang had relied on the equity ground, he never considered Ms. Antioco's argument about her mother's advanced age and failing health that she raised at both CDP hearings. Section 6159 authorizes the Commissioner to enter into an installment agreement where it will "facilitate full or partial collection." <u>See</u> sec. 6159(a); sec. 301.6159-1(a), Proced. & Admin. Regs. The Internal Revenue Manual states that a taxpayer does not qualify for installment agreements if the taxpayer's account can be fully or partially satisfied by liquidating assets, unless

**[\*27]** "factors such as advanced age, ill-health, or other special circumstances are determined to prevent the liquidation of the assets." IRM pt. 5.14.1.4(6) (Sept. 26, 2008).

Ms. Antioco repeatedly brought up in her CDP hearings that she was the caretaker for her now 96-year-old mother, who suffers from congestive heart failure and wears a pacemaker, and noted that her mother lives in one of the apartments connected to hers. She indicated she was concerned that her mother would not be able to survive the sale of the building and subsequent move because of her health and advanced age. Ms. Antioco, a senior citizen herself, was also worried that she and her mother would have difficulty finding somewhere else to live. These were precisely the reasons Ms. Antioco listed as grounds for entering into a short-term installment agreement until she could either obtain a loan or sell the building after her mother passed away. And after Mr. Owyang had manual liens placed on the property, she noted that the government's interest would be fully protected during this temporary reprieve from the levy.

But Mr. Owyang failed to meaningfully consider this argument during Ms. Antioco's supplemental CDP hearing. And he didn't make any findings anywhere in the administrative record about Ms. Antioco's special circumstances, other than that Ms. Antioco was "using her 95 year old mother as an emotional diversion." On

**[*28]** brief the Commissioner again supplied the reasoning for not accepting Ms. Antioco's installment agreement despite these circumstances: Ms. Antioco and her mother don't share the same household--they live in separate apartments in the same building. And Ms. Antioco hasn't provided evidence that she had "specially modified" her mother's apartment, "as might be required if she had a specific handicap" (as opposed to simply being a nonagenarian with congestive heart failure) or that her mother cannot be safely moved to a different residence. We again refuse to accept the Commissioner's *post hoc* justification for rejecting Ms. Antioco's special-circumstances argument. We find instead that it was an abuse of discretion for Mr. Owyang not to consider Ms. Antioco's argument--as required under section 6330(c)(3)(B)--that special circumstances warranted accepting her proposed collection alternative. See <u>Blosser v. Commissioner</u>, T.C. Memo. 2007-323, 2007 WL 3145516, at *4.

> 2. <u>Economic Hardship</u>

Section 6343(a)(1)(D) tells the Commissioner to release a levy upon all, or part of, a taxpayer's property if he determines that a levy would cause economic hardship to a taxpayer. A regulation tells us that a levy causes "economic hardship" when it would cause the taxpayer to be unable to pay her reasonable basic living expenses. Sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs. A taxpayer

**[\*29]** can't just say this; she has to submit complete and current financial information to the Commissioner. See Picchiottino v. Commissioner, T.C. Memo. 2004-231, 2004 WL 2284376, at \*5-\*6. In a CDP hearing, if a taxpayer does provide financial information that shows the proposed levy would create economic hardship for her, the Appeals officer cannot go forward with the levy and has to consider an alternative. See Vinatieri v. Commissioner, 133 T.C. 392, 401 (2009).

Ms. Antioco used the words "hardship" and "economic hardship" in numerous letters that she sent to the Appeals officer in her first hearing to describe what would happen if the IRS levied on her apartment building. Her lawyer again raised this argument at her supplemental hearing. This should have made it clear to the Appeals officers that they needed to consider her argument. Yet the administrative record reflects that Mr. Owyang didn't even make any determination about economic hardship, and the words "hardship" and "economic hardship" do not even appear in the supplemental notice of determination. Mr. Owyang didn't even ask for a revised Form 433-A--the reason we remanded in the first place--which would have allowed him to determine Ms. Antioco's income from renting the other apartments in her building and if levying on the property would cause her hardship.

[*30] Mr. Owyang testified at trial that the reason he didn't consider economic hardship in making his determination is that Ms. Antioco never raised the issue. But he also testified that he had read the communications from Ms. Antioco's first CDP hearing and he admitted that Ms. Antioco's attorney had mentioned hardship as well. His testimony on this point is simply not believable.

The Commissioner argues on brief that Ms. Antioco's apartment building should not be protected as her principal residence[8] because of the amount of equity and the lack of special improvements. He also argues that Ms. Antioco's alleged economic hardship can be remedied by selling the building and using the approximately $700,000 in net proceeds[9] to pay her and her mother's reasonable basic living expenses. He admits that selling the property would deprive Ms.

---

[8] Ms. Antioco also argued in her renewed request for an installment agreement that section 6334 exempts her apartment building from levy because it serves as her principal residence. See sec. 6334(a)(13)(B)(i), (e)(1). Mr. Owyang correctly determined that section 6334(e) allows a levy on a principal residence once a District Court judge or magistrate approves the levy in writing. See sec. 6334(e)(1)(A). This means that even if we were to uphold the proposed levy, the IRS would still have to obtain approval from a District Court before levying on Ms. Antioco's building. That court's review may overlap with our own. See Foley v. Commissioner, T.C. Memo. 2007-242, 2007 WL 2403732, at *3 n.2.

[9] The Commissioner never explained how he reached this number, but we assume he calculated it based on a fair market value of $1.9 million (what Ms. Antioco paid for the property in 2007), and not some more recent post-crash appraisal.

[*31] Antioco of the income she currently receives from renting out the other units but states that she would receive enough money from the sale to pay living expenses or invest in a new venture.

These arguments are also nowhere to be found in the administrative record. The fact is that Mr. Owyang failed to consider Ms. Antioco's economic-hardship argument or to ask for the relevant financial information to determine whether levying on the property would cause her hardship. His failure to do so was an abuse of discretion.

III.   Remedy

We have found that Mr. Owyang abused his discretion in sustaining the proposed levy and that we cannot uphold the supplemental notice of determination on any of the stated grounds. Ms. Antioco asks that we decide she is entitled to an installment agreement instead of remanding to Appeals for yet another CDP hearing. We hesitate to hold that we ourselves can independently review whether a proposed collection alternative is acceptable. See Murphy, 125 T.C. at 320. In any event, Mr. Owyang never asked for a revised Form 433-A, so we couldn't even begin to evaluate whether Ms. Antioco's $1,000 per month installment-agreement -with-expectation-of-refinancing-and-protection-by-lien alternative was appropriate.

**[*32]** We will therefore again remand the case to Appeals to consider Ms. Antioco's proposed installment agreement, her financial information, and whether special circumstances or economic hardship exists.

<u>An appropriate order will be issued</u>.