# United States Tax Court

T.C. Memo. 2023-59

DUANE WHITTAKER AND CANDACE WHITTAKER,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 3147-21L.                    Filed May 15, 2023.

————————

*Caleb B. Smith*, for petitioners.[1]

*Lisa R. Jones* and *Paul A. George*, for respondent.

## MEMORANDUM OPINION

HOLMES, *Judge*: Duane and Candace Whittaker offered to settle their $33,000 tax bill for only $1,629.[2] The Whittakers argued that the Commissioner should accept such a low offer because they were both near retirement age and burdened with significant unpaid debt and loss of their jobs during the pandemic. The IRS's settlement officer rejected the offer because she concluded that the Whittakers had enough income and home equity to pay the tax bill in full.

---

[1] The Whittakers were clients of the University of Minnesota Ronald M. Mankoff Tax Clinic, which gives students the opportunity to represent clients before the IRS and the courts. The Court thanks them for their work on this case.

[2] In addition to the $33,000 bill stemming from 2015, the Whittakers intended the $1,629 to also satisfy their liabilities from 2004, 2005, 2006, and 2018. Taken together, the Whittakers total outstanding liability was around $50,000 at the time of their offer. We focus on the sum from 2015 since that is the tax directly at issue.

[*2]   The question in this case is whether this rejection was an abuse of discretion.

*Background*

The Whittakers are hardworking people—Mrs. Whittaker was a family and community-empowerment specialist for a local school district who also worked part time as a tutor and as a mall security guard. Mr. Whittaker is a veteran and self-employed personal trainer. The couple have faced financial hardship long before 2015. They have significant unpaid debts, including even unpaid student loans of more than $60,000, and other personal debt of about $10,000.

They also have tax troubles. They owe the IRS income tax for tax years 2004–06 and 2018. And they owe Minnesota about $9,700 for their 2015 tax year.

In 2018 the Commissioner sent them a notice of his intent to levy to collect their 2015 tax debt. The Whittakers timely asked for a collection due process (CDP) hearing under section 6330.[3] The Whittakers wanted to compromise their tax debt, which triggered the IRS to refer their case to an IRS offer examiner who told them that they needed to fill out and return IRS Form 433–A (OIC), Collection Information Statement for Wage Earners and Self-Employed Individuals, if they wanted her to consider an alternative to forced collection.

After a telephone conference between one of their lawyers and the examiner, the Whittakers submitted an offer-in-compromise (OIC) in May 2019. By the time they submitted the OIC, the Whittakers were in their mid-60s, and Mrs. Whittaker was less than a year away from retirement from the Northwest Suburban Integration School District.

The OIC included a completed Form 433–A, exhibits such as the mortgage statement for their home, their county property-tax statement, and a tax order from the Minnesota Department of Revenue. They also included a copy of a retirement letter for Mrs. Whittaker, her employment contract with the school district, her Social Security benefits statement, pay stubs from her jobs with the school district and

---

[3] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*3]** the mall, and a list of her expenses that included her student-loan, health-care billing, and personal credit-card statements to paint the full picture of her financial situation. They included a copy of a money order for an initial 20% payment of $325.80 for their OIC.[4] The OIC also included a number of exhibits from Mr. Whittaker—a profit-and-loss statement for his personal-training business, business checking-account statements, and a military-pay letter from the Department of Defense. The Whittakers noted that they could provide additional information to support their claims in the OIC if the IRS so desired.

In their OIC, the Whittakers stressed that their age and difficult financial situation meant that they would very soon have to rely on their retirement savings as a source of income rather than as a nest egg. They also volunteered that they could not borrow against their home both because it was in disrepair and because the terms of their mortgage forbade it.

The IRS usually shuffles the OICs that taxpayers send in to a centralized unit unimaginatively called the Centralized Offer in Compromise Unit. This part of the IRS bureaucracy rejected the Whittakers' OIC in February 2020. Someone at the Unit calculated that the Whittakers could pay—or to use IRS jargon, had a reasonable collection potential (RCP) of—about $250,000. The case-activity record (the equivalent of timesheets for IRS employees) shows that the Whittakers' lawyer spoke with a settlement officer who explained that "the special circumstances [that the Whittakers raised] were considered; but did not warrant acceptance of the offer." There was, however, nothing in the activity record to suggest that the settlement officer asked the Whittakers about their ability to access their equity in their home.

When the Unit thinks it should reject a taxpayer's OIC, the IRS still allows an appeal to a different part of the IRS, the IRS Office of Appeals. (It has since been rechristened the IRS Independent Office of Appeals. Taxpayer First Act, Pub. L. No. 116-25, § 1001, 133 Stat. 981, 983 (2019).) The Whittakers' timing couldn't have been worse—their appeal hit IRS Appeals just as the pandemic hit the country. After a hearing in March 2020, the record shows that the settlement officer

---

[4] The IRS requires taxpayers who want an OIC to pay an application fee and submit an initial partial payment. The Whittakers at first neglected to include the fee along with the partial payment. After being notified of the error, the Whittakers' attorney sent the required sum.

**[\*4]** reached out to one of the Whittakers' lawyers to schedule a second hearing.[5] But there were long gaps between her attempts to reach the Whittakers' lawyers, and their lawyers did not finally get in touch with the settlement officer until September 2020.

Their conversation seems to have been short. One of the lawyers spoke with the settlement officer and asked for a call back to discuss the case. Later that day, after looking through the files for about 15 minutes, the settlement officer did call back to say that she agreed with the rejection because the Whittakers had an RCP of about $250,000 against a total liability of about $50,000.[6] The settlement officer reiterated that the special circumstances that the Whittakers raised in their OIC were considered, but that she thought their offer was way too low because the Whittakers could fully pay without hardship. The settlement officer pointed out, for instance, that the Whittakers could fully pay the liability with "just one of the investment account[s,] leaving the other investment and the equity in the home." She did offer the Whittakers a streamlined installment agreement[7] and gave their lawyer time to speak with the Whittakers to see if that was what they wanted.

Remember, though, that this was in the middle of the worst part of the pandemic. The Whittakers responded with a five-page fax, in which they again argued that the IRS should accept their OIC, but also

---

[5] The activity record shows a call made in February 2020, and another one in September 2020. The notes from the voicemail left in September 2020 refer to a call made in May 2020. If such a call was made, however, it is not logged in. According to the activity record, the February 2020 call was not answered, but the settlement officer left her number for a call back. The September 2020 call was returned the same day.

The University of Minnesota Tax Clinic disputes that it received calls in either February 2020 or May 2020. It claims that the first contact it received from the settlement officer was September 2020, and it also states that in August 2020 it had checked in with the IRS offer examiner about the status of the case and was told that there was no activity log.

The record does show that the clinic supervisor, Professor Caleb Smith, wrote to the IRS offer examiner in December 2019. We do think that there was a failure to communicate, but the entire world wasn't operating under its standard procedures for much of 2020. And in the end these delays don't affect our analysis.

[6] This total includes $33,000 for 2015; the rest is from tax years 2004–06 and 2018.

[7] Streamlined installment agreements (SIAs) are installment agreements that can last up to 72 months and are available to taxpayers with liabilities of $50,000 or less. *Internal Revenue Manual* (IRM) 5.19.1.6.4(10) (Sept. 26, 2018).

**[\*5]** told the settlement officer that their circumstances had changed: Mr. Whittaker was by then completely retired, and Mrs. Whittaker was limited to working two weekends a month.

The settlement officer acknowledged the fax a few days later, but said it was not enough and that she "would not be accepting the offer as a collection alternative." She reiterated that she considered the Whittakers' ages but that they "did not warrant acceptance of the offer." She noted a small error that the Unit had made—calculating the family's monthly income as $740 instead of $764. She also observed that Mrs. Whittaker held a separate retirement account at Charles Schwab and speculated that she must be entitled to a pension from the school system. Here we come to a gap in the record: There are two Forms 1099–Rs from Schwab, that show a total distribution of around $600, but there is no other information about what these accounts are or how much was in them. There's also no evidence of a pension for Mrs. Whittaker or its amount. (Though we also note that the Whittakers don't deny that Mrs. Whittaker has earned a pension from her years with the school district.)

The settlement officer reasoned that Mrs. Whittaker's school pension would be more than the small pay she received from her part-time job. As for Mr. Whittaker, the settlement officer claimed that instead of the $1,394 per month pension that was reported, Mr. Whittaker's "true pension amount from the military and national finance is $2,253.00."[8] Because the Whittakers were neither living on a fixed income nor disabled, she concluded that they did not qualify for special circumstances under IRM 5.8.11.3.1(5), (6), and (7) (Oct. 4, 2019).[9] She did acknowledge that the pandemic had changed the Whittakers' circumstances, but she was willing to consider only a

---

[8] This is a mistake but it's harmless because the settlement officer did not substitute this higher number in the RCP calculation. *See Watchman v. Commissioner*, 103 T.C.M. (CCH) 1620, 1624 (2012) ("Error is harmless when it causes no prejudice or does not affect the ultimate determination.").

[9] Unless otherwise noted, the Court cites to the provisions of the IRM that were in effect November 2020, when the Appeals Office issued the notice of determination that we review here. *See Jones v. Commissioner*, 104 T.C.M. (CCH) 364, 370 (2012) (using IRM from year of the notice of deficiency (NOD)).

**[\*6]** postponement of collection until after July 15, 2021,[10] and made no changes to the Unit's worksheets.

As for the Whittakers' argument that they were unable to borrow against the equity in their home because it was in serious disrepair and their mortgage wouldn't allow it, the settlement officer simply wrote that she "also reviewed IRM 5.8.5.10(4) and IRM 5.8.5.13(5)." The settlement officer also stated that if the Whittakers took money out of their retirement accounts, then the settlement officer would list the money as a dissipated asset since the Whittakers had been working in 2019.

All this meant that there would be no agreement. The settlement officer drafted a notice of determination that upheld the IRS's decision to proceed to forced collection. In the notice, she sustained the rejection by stating that there were no special circumstances to justify the Whittakers' failure to propose an adequate OIC.

The Whittakers lived in Minnesota when they filed their petition.[11] The parties agreed to submit the case for decision under Rule 122.

*Discussion*

CDP hearings often lead to settlements because they allow a taxpayer to suggest alternatives to the harsher methods the IRS can use to collect debts. *See* § 6330(c)(2)(A)(iii). One such alternative is an offer in compromise, a taxpayer's request that the Commissioner settle old tax debt for less than its face value. "Offer in compromise" is a generic term that comes in three species: doubt as to liability, doubt as to collectibility, or promotion of effective tax administration. Treas. Reg. § 301.7122-1(b). The IRS may accept an OIC for doubt as to liability when there is a genuine dispute about the existence or amount of a taxpayer's debt. *Id.* subpara. (1). It may accept an OIC for doubt as to collectibility when a "taxpayer's assets and income are less than the full amount of [his] liability." *Id.* subpara. (2). And it may accept an OIC for effective tax administration when it might be able to collect in full but

---

[10] The activity report states that the collection could be held off until July 15, 2020, but this entry is dated October 2020. We think this means that the IRS agreed to hold off collection until July 2021.

[11] Appellate venue thus presumptively lies in the Eighth Circuit. *See* § 7482(b)(1)(G).

**[\*7]** only by causing a taxpayer to suffer economic hardship. *Id.* subpara. (3).

The Whittakers' offer was based on doubt as to collectibility, which means that they were saying that their assets and income weren't enough to pay their tax debt in full. *See id.* para. (a)(1), (b)(2). The Commissioner has discretion to accept or reject the offer. *Id.* para. (c). We have jurisdiction to review any rejection of an OIC, even one that includes liabilities for tax years in addition to those that were the subject of the CDP hearing. *See, e.g., Sullivan v. Commissioner*, 97 T.C.M. (CCH) 1010, 1014–15 (2009). That was the situation here—the Whittakers' CDP hearing was about their 2015 tax debt, but their OIC proposed a settlement of their tax liabilities from 2004–06 and 2018 as well. Our decision, however, is confined to the tax year before us.

The Commissioner has guidelines to enable settlement officers to evaluate offers and maintain some reasonable degree of uniformity. The key concept under these guidelines is the calculation of a taxpayer's RCP, the IRS's analysis of how much it thinks a taxpayer can pay. A settlement officer's calculation of an RCP depends on his estimate of the taxpayers' assets and likely future income. *See* IRM 5.8.4.3.1 (Apr. 30, 2015). The IRS typically calculates likely future income by multiplying a taxpayer's monthly disposable income (gross income minus necessary living expenses) by a certain number of months. *See id.*

The Commissioner's discretion is very wide. We review his determination, at least in cases like this one in which the amount of tax owed is not in question, only for abuse of discretion. *Sego v. Commissioner*, 114 T.C. 604, 610 (2000). We find an abuse of discretion when a determination is based "on an erroneous view of the law or a clearly erroneous assessment of the facts." *See Fargo v. Commissioner*, 447 F.3d 706, 709 (9th Cir. 2006) (quoting *United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir. 1997)), *aff'g* 87 T.C.M (CCH) 815 (2004). We also find an abuse of discretion when the Commissioner applies "the correct law to the facts which are not clearly erroneous but rule[s] in an irrational manner." *Trout v. Commissioner*, 131 T.C. 239, 245 (2008) (quoting *Indus. Inv. v. Commissioner*, T.C. Memo. 2007-93). The Eighth Circuit phrases the test a bit differently: We should disturb the Commissioner's determination only if it constituted "a clear abuse of discretion in the sense of clear taxpayer abuse and unfairness by the IRS." *Fifty Below Sales & Mktg., Inc. v. United States*, 497 F.3d 828, 830 (8th Cir. 2007). We are also limited in our review to the reasoning set out in the notice of determination and not what the IRS's lawyer or we

**[\*8]** ourselves might come up with. *See, e.g.*, *Antioco v. Commissioner*, 105 T.C.M. (CCH) 1234, 1240 (2013); *Jones*, 104 T.C.M. (CCH) at 369; *Salahuddin v. Commissioner*, 103 T.C.M. (CCH) 1764, 1768 (2012).

In cases appealable to the Eighth Circuit, we also limit what we look at—our scope of review—to the administrative record, not a new record made in court after a trial *de novo. Robinette v. Commissioner*, 439 F.3d at 459.

In this case both parties make a great deal about various provisions in the IRS's IRM. The IRM *is* important here—it enables the IRS itself to put some bounds on its employees' exercise of discretion. But the IRM "does not have the force of law and does not confer rights on taxpayers." *Fargo v. Commissioner*, 447 F.3d at 713. Its guidance is usually quite reasonable, however, and we generally uphold a determination to reject an offer if the settlement officer has followed it. *Atchison v. Commissioner*, 97 T.C.M. (CCH) 1034, 1036 (2009).

The question here is whether the Commissioner abused his discretion by failing adequately to consider:

- The Whittakers' reliance on their retirement account for income;

- the special circumstances that they raised (i.e., their nearing retirement and inability to borrow against their home); and

- the change in the Whittakers' financial condition caused by the pandemic.

We address these issues in order.

I.  *Retirement Account*

We first look at the question of how the Commissioner should look at the Whittakers' retirement accounts in calculating their RCP. The Whittakers argue that, because they are nearing retirement, the money in those accounts should be viewed as generating income over time, not as an asset to be liquidated to pay their tax debt. When the Whittakers submitted their OIC in May 2019, they reported that their monthly household income was $740 in gross wages; $1,895 in Social Security; $58 in other income for Mrs. Whittaker; $290 in net business income; and a $1,394 pension for Mr. Whittaker. Even though Mrs. Whittaker was earning $4,357 per month in gross wages from her primary job at

**[\*9]** the school district when they submitted their offer, she included only the wages she earned as a part-time mall security guard because her regular job was set to end when she retired in June 2019. If one doesn't include this income, the Whittakers monthly household expenses—which they said totaled up to $4,512—would be higher than their projected income.

They argue that even while employed they had no disposable income, and that due to Mrs. Whittaker's imminent retirement, they would have even less monthly income in the future. They specifically cite IRM 5.8.5.10 (Mar. 23, 2018), which states that a taxpayer within one year of retirement may have his retirement accounts treated as income; and IRM 5.8.5.20(4) (Sept. 30, 2013), which states that taxpayers who are retiring may have their future income and expenses adjusted in calculating their RCP. They think these parts of the IRM should have made the IRS increase their projected income a bit, but taken the value of the accounts entirely off the asset-side of the RCP computation—changes that they also say would make their OIC more reasonable. They also point to an authority higher than the IRM that both the IRS and we have to follow—there's a Treasury Regulation that says that the IRS may compromise a tax debt if a taxpayer has a retirement account with sufficient funds to fully pay his liability, but who would be unable to pay for basic living expenses afterwards if he did so. Treas. Reg. § 301.7122-1(c)(3)(iii) (example 2).

The settlement officer here included the Whittakers' retirement accounts as assets that they could liquidate. The Commissioner emphasizes that neither the regulation nor the IRM *requires* a settlement officer to treat retirement savings only as a source of income. And he's right about that—they both say that when a taxpayer is within one year of retirement, the settlement officer *may* characterize retirement funds as income when the income is required to provide necessary living expenses. *See* Treas. Reg. § 301.7122-1(c)(3)(iii); IRM 5.8.5.10(4).

When taxpayers like the Whittakers make an OIC and argue that they have special circumstances, all agree that the IRS should consider additional factors beyond income and basic living expenses. *See* IRM 5.8.11.2.1(2) (Aug. 5, 2015). Those additional factors include age, employment status, the number and health of any dependents, their medical condition, and their ability to earn a living. *Id.* (5), (6), and (7). When specifically evaluating the taxpayer's medical condition, we have usually considered "medical catastrophe and . . . long-term illness . . . or

**[\*10]** disability that render a taxpayer incapable of earning a living." *Leago v. Commissioner*, 103 T.C.M. (CCH) 1210, 1215 (2012).

In her activity record, the settlement officer noted that the Whittakers "submitted the special circumstances," that those circumstances were "considered," but that they "did not warrant acceptance of the offer." She noted that the Whittakers did not have any long-term illnesses, were not disabled, and were not living on a fixed income.

We see here no erroneous view of the law and no clearly erroneous assessment of the facts. It looks like the settlement officer considered the additional factors noted in IRM 5.8.11.2.1(5), (6), and (7) that might affect a taxpayer's financial condition. The Commissioner is correct that the settlement officer is not *required* to consider retirement savings only as a source of income if a taxpayer is within one year of retirement. *See* IRM 5.8.5.10(4). But there may be a problem for the Commissioner— this reasoning didn't make it into the notice of determination, no matter that it is reasonably clear in the administrative record as a whole. There is some ambiguity in the law here—we typically say that we confine our review to the reasoning in the notice of determination, but administrative-law cases more generally do let a reviewing court "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citing *Colo. Interstate Gas Co. v. FPC*, 324 U.S. 581, 595 (1945)).

II.    *Home Equity*

We find less ambiguous problems with the exercise of discretion on the second issue that the Whittakers raise: the treatment of the equity in their home. In their OIC, the Whittakers explained that they bought their home in 1984 but refinanced it under the Home Affordability Refinance Program, which helps homeowners who owe more than their property is worth. That refinancing requires a balloon payment in 2034, and the Whittakers argue that this makes it impossible for them to borrow against the property. Though their OIC acknowledged that the county's assessed value of their home was $243,000, they also argued that its actual value was lower because of serious structural issues that require repair. They contended that their position meant that the value of their home in the RCP calculation should have been zero. They also offered to provide the IRS more

**[*11]** information on the loan terms, the home's value, and the unwillingness of banks to refinance.

The Unit adopted the county's assessed value of the Whittakers' home in its analysis of the OIC. It figured that the quick sale value[12] of the home was $194,400. The Whittakers had a mortgage for $85,237, and so a net equity of $109,163. This analysis, however, ignored the Whittakers' contention that the home was worth less than its assessed value due to its condition as well as their contention that they are unable to tap that equity because of the restrictive terms of their mortgage. The settlement officer did not address these arguments, but disregarded them and adopted the Unit's valuation.

The Whittakers renew this argument here. And the IRM does specifically mention that a taxpayer's inability to borrow against equity is a special circumstance. IRM 5.8.11.2.1(6)(3.).

The Commissioner tries to tear it down. He first points to the Whittakers' mortgage-account statement. It shows an outstanding principal balance of $108,762.35 as of October 3, 2018. That balance, coupled with an assessed value of $243,000, the Commissioner argues, means that their home is no longer under water. He surmises that there is enough equity to fully pay their outstanding tax debt. To this the Whittakers reply that they can't refinance their home under their peculiar circumstances and that it's in such a state of disrepair that the assessed value doesn't reflect its fair market value. The Commissioner responds that refinancing both regular and deferred principal balances is not any more complicated than refinancing a loan with a first and second mortgage, and he urges us to find no abuse of discretion by the settlement officer in concluding that there was at least $50,000 worth of available equity to fully pay the liability. The Commissioner also argues that the Whittakers' allegation that this home has serious structural problems should be ignored for lack of specificity.

The IRS does need to take problems with possible refinancing a home seriously. For example, in *Antioco*, 105 T.C.M. (CCH) at 1236, the taxpayer submitted proof of her attempts to refinance after the settlement officer asked for such documents to help the officer make her determination. Here, although the Whittakers didn't submit such proof,

---

[12] The IRS defines the quick sale value to be "[t]he amount that could be obtained if an asset is sold quickly, usually less than [fair market value]." IRM 5.8.1-1 (Nov. 8, 2018).

[*12] they said that they would and could if the settlement officer had only asked. The Whittakers have a point—there's nothing in the administrative record that states or even suggests that the examiner at the Unit or the settlement officer during the CDP hearing asked for any information in addition to the appraised value. The settlement officer noted that she "advised [the Whittakers' lawyer] that the special circumstances were considered; but did not warrant acceptance of the offer" and that she "was not going to remove the equity for the investment because the taxpayers can fully pay with one of the retirement accounts; plus, the taxpayers have over $100,000 in equity in the home." There's no evidence in the record of any consideration of the Whittakers' arguments on this point.

We therefore find that the settlement officer's conclusion about the Whittakers' ability to tap the equity in their home was clearly erroneous on this record. This makes her reliance on that equity in her RCP calculations an abuse of discretion.

III.    *COVID-19 Pandemic*

There is, however, a more serious problem with the determination here: While the OIC was before the IRS, the pandemic hit. As it did for so many Americans, the pandemic changed the Whittakers' fortunes. The record shows that the settlement officer received a fax from the Whittakers' lawyer specifying those changed circumstances—namely that Mr. Whittaker had completely retired, and Mrs. Whittaker was limited to working only two weekends a month. The settlement officer acknowledged receipt of the fax but explained that she "would not be accepting the offer as a collection alternative." The settlement officer instead offered to hold off on collection until July 2021. She reasoned that Mrs. Whittaker had enough pension income and that a slight delay in collection would be enough to reflect their changed circumstances brought on by the pandemic. As for Mr. Whittaker, the settlement officer reasoned that "his true pension amount from the military and national finance is $2,253." The Commissioner now concedes that the settlement officer was mistaken and that Mr. Whittaker had a military pension of only $1,394 per month. But he argues that the mistake is harmless since the settlement officer didn't substitute her higher numbers in the RCP calculation. The settlement officer reasoned that the Whittakers should still not receive an OIC because they were neither living on a fixed income nor disabled.

**[\*13]** The Commissioner concedes that this response has not been "as well documented in the administrative file as the other issues," but suggests that the abrupt collapse in the Whittakers' income meant that "the [settlement officer] should not have focused [solely] on delayed collection" by "hold[ing] off on [the] collection until after 7/15/2[1]."[13] The Commissioner claims that the settlement officer's mistake was harmless. *See Watchman*, 103 T.C.M. (CCH) at 1624. Because the settlement officer still considered other factors, such as Mrs. Whittaker's pension accounts and Mr. Whittaker's actual military pension of $1,394 per month to conclude that their financial condition during the pandemic did not change, the calculus did not affect the ultimate determination, and thus her error is harmless.

Perhaps realizing the weakness of the settlement officer's reasoning on this issue, the Commissioner bolsters his argument by asking us to note that the Mall of America reopened after being closed for only three months. He also asks us to note that the lockdown inspired a nationwide surge in the demand for fitness equipment, and given that Mr. Whittaker's business website in personal fitness was still up and running as of May 2022, he may not in fact have been completely retired.

We must decline the Commissioner's suggestions. Evidence of reopening of the Mall of America or increased sales of personal fitness equipment during the pandemic aren't in the administrative record. We won't consider them.

Upholding the rejection of the Whittakers' offer because Mrs. Whittaker's mall job *may* have resumed or Mr. Whittaker *might* be able to run a training business using potential clients' possible pandemic purchases is entirely speculative. These *post hoc* rationalizations are precisely what *Chenery* bars. *See Antioco*, 105 T.C.M. (CCH) at 1240.

The settlement officer "did not think that the loss of the Whittakers wage income or self-employment income [due to the pandemic] sufficiently mattered to justify reworking the Offer Worksheet." Even in the Unit's analysis of their original OIC, however, the Whittakers' net monthly income was calculated to be only $255. Adjusting those calculations to reflect their income after the pandemic hit would show a net income deficit. The settlement officer's explicit

---

[13] As mentioned, the record states the promise to hold off collection was until July 7. For the reasons explained *supra* note 10 we presume this was intended to mean 2021.

**[\*14]** refusal to rework the worksheet despite the very considerable discrepancy in the calculation before and after the pandemic is a clear error and thus an abuse of discretion.

IV. *NOD*

"[W]e can uphold the Appeals Office's determination only on grounds actually relied upon by the Appeals officer in the notice of determination." *Jones*, 104 T.C.M. (CCH) at 367 (citing *Salahuddin*, 103 T.C.M. (CCH) at 1768). The NOD issued by the Commissioner was sparse and contained little if any rationale behind the determination. It stated:

> After considering your [attorneys] statements by telephone and fax information, Appeals sustained the rejection of the offer because the tax is held to be legally due and an amount larger than the offer appears to be collectible. We have not found that an exceptional circumstance exists that allows our acceptance of your offer. We do not have authority of accept an offer in these circumstances.

No mention of the retirement accounts, no mention of the equity in the home or its condition, and no mention of the pandemic. Even though our own review of the record as a whole shows enough for us to conclude there were an abuse of discretion, the absence of reasoning on the basis of that record in the NOD itself might well be decisive all on its own.

It is another ground for us to find that the IRS abused its discretion.

V. *Remedy*

We can remand a CDP case to IRS Appeals when a settlement officer has abused her discretion in some way, *see Med. Prac. Sols., LLC v. Commissioner*, 98 T.C.M. (CCH) 242, 247 (2009); or didn't develop the record enough for us to properly review it, *see Hoyle v. Commissioner*, 131 T.C. 197, 205 (2008); *Churchill v. Commissioner*, 102 T.C.M. (CCH) 116, 118 (2011).

We have also remanded where a taxpayer has experienced a material change in circumstances between the time of the CDP hearing and the time of trial in some way that affects the RCP calculation. *Leago*, 103 T.C.M. (CCH) at 1210 (remanding when the taxpayer developed

**[\*15]** medical issues); *Churchill*, 102 T.C.M. (CCH) at 116 (remanding when RCP changed due to divorce); *Harrell v. Commissioner*, 86 T.C.M. (CCH) 378 (2003) (remanding because of intervening Supreme Court decision).

The Whittakers lost their jobs in the middle of the CDP hearing. Because their current income was important to the RCP calculation, this was a material change of circumstances. On remand the Appeals Office is directed to consider updated financial information that they should provide to document any change in their ability to pay resulting from their loss of income due to the pandemic, as well as other factors in accord with this opinion.

*An appropriate order will be issued.*